*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

STATE OF ALASKA; PATRICK S. )
GALVIN, in his official capacity )     Supreme Court No. S-14935
as Commissioner of the Alaska )
Department of Revenue; and JOHN )     Superior Court No. 1JU-10-00376 CI
MALLONEE, in his official )
capacity as Director of the Alaska )    O P I N I O N
Child Support Services Division, )
)
)     No. 7093 – March 25, 2016
          Appellants, )
)
      v. )
)
CENTRAL COUNCIL OF TLINGIT )
AND HAIDA INDIAN TRIBES OF )
ALASKA, on its own behalf and as )
*parens patriae* on behalf of its )
members, )
)
          Appellee. )
_____)

Appeal from the Superior Court of the State of Alaska, First Judicial District, Juneau, Philip M. Pallenberg, Judge.

Appearances:  Mary Ann Lundquist, Senior Assistant Attorney General, Fairbanks, Stacy K. Steinberg, Chief Assistant Attorney General, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for Appellants.  Jessie Archibald, CCTHITA Child Support Unit Attorney, Juneau, and Holly Handler and Sydney Tarzwell, Alaska Legal Services Corporation, Juneau, for Appellee.  Erin C. Dougherty and Matthew N. Newman, Native American Rights Fund, Anchorage, for Amicus Curiae National

Association of Tribal Child Support Directors. Karen L. Loeffler, United States Attorney, and Richard L. Pomeroy, Assistant United States Attorney, Anchorage, and Ragu-Jara Gregg and Stacy Stoller, Department of Justice, Washington, D.C., for Amicus Curiae United States.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

FABE, Chief Justice.
WINFREE, Justice, with whom STOWERS, Justice, joins, concurring in part.

## I.    INTRODUCTION

A federally recognized Alaska Native tribe has adopted a process for adjudicating the child support obligations of parents whose children are members of the tribe or are eligible for membership, and it operates a federally funded child support enforcement agency. The Tribe sued the State and won a declaratory judgment that its tribal court system has subject matter jurisdiction over child support matters and an injunction requiring the State's child support enforcement agency to recognize the tribal courts' child support orders in the same way it recognizes such orders from other states. Because we agree that tribal courts have inherent subject matter jurisdiction to decide the child support obligations owed to children who are tribal members or are eligible for membership, and that state law thus requires the State's child support enforcement agency to recognize and enforce a tribal court's child support orders, we affirm.

## II. FACTS AND PROCEEDINGS

### A. The Uniform Interstate Family Support Act

The Uniform Interstate Family Support Act (UIFSA)[1] governs Alaska's enforcement of child support orders issued by tribunals other than Alaska's state courts. Federal child support enforcement funds are conditioned on a state's passage of UIFSA,[2] and as a result every state in the country has enacted identical legislation.[3]

---

[1]  AS 25.25.101 *et seq.*

[2]  42 U.S.C. § 666(f) (2012) (to qualify for reimbursement, "each State must have in effect the Uniform Interstate Family Support Act").

[3]  *See* ALA. CODE § 30-3A-101 *et seq.* (2014); ARIZ. REV. STAT. ANN. § 25-1201 *et seq.* (2014); ARK. CODE ANN. § 9-17-101 *et seq.* (2014); CAL. FAM. CODE § 4900 *et seq.* (West 2014); COLO. REV. STAT. § 14-5-101 *et seq.* (2014); CONN. GEN. STAT. § 46b-212 *et seq.* (2014); DEL. CODE ANN. tit. 13, § 6-101 *et seq.* (2014); D.C. CODE § 46-301.01 *et seq.* (2014); FLA. STAT. § 88.0011 *et seq.* (2014); GA. CODE ANN. § 19-11-100 *et seq.* (2014); HAW. REV. STAT. § 576b-101 *et seq.* (2014); IDAHO CODE ANN. § 7-1001 *et seq.* (2014); 750 ILL. COMP. STAT. 22/101 *et seq.* (2014); IND. CODE § 31-18-1-1 *et seq.* (2014); IOWA CODE § 252k.101 *et seq.* (2014); KAN. STAT. ANN. § 23-36,101 *et seq.* (2014); KY. REV. STAT. ANN. § 407.5101 *et seq.* (West 2014); LA. CHILD. CODE ANN. art 1301.1 *et seq.* (2014); ME. REV. STAT. tit. 19-A, § 2801 *et seq.* (2014); MD. CODE ANN., FAM. LAW § 10-301 *et seq.* (2014); MASS. GEN. LAWS ch. 209D, § 1-101 *et seq.* (2014); MICH. COMP. LAWS § 552.1101 *et seq.* (2014); MINN. STAT. § 518C.101 *et seq.* (2014); MISS. CODE ANN. § 93-25-1 *et seq.* (2014); MO. REV. STAT. § 454.1500 *et seq.* (2014); MONT. CODE ANN. § 40-5-101 *et seq.* (2014); NEB. REV. STAT. § 42-701 *et seq.* (2014); NEV. REV. STAT. § 130.0902 *et seq.* (2014); N.H. REV. STAT. ANN. § 546-B:1 *et seq.* (2014); N.J. STAT. ANN. § 2a:4-30.65 *et seq.* (West 2014); N.M. STAT. ANN. § 40-6a-100 *et seq.* (2014); N.Y. FAM. CT. ACT § 580-101 *et seq.* (McKinney 2014); N.C. GEN. STAT. § 52c-1-100 *et seq.* (2014); N.D. CENT. CODE § 14-12.2-01 *et seq.* (2013); OHIO REV. CODE ANN. § 3115.01 *et seq.* (2014); OKLA. STAT. tit. 43, § 601-100 *et seq.* (2014); OR. REV. STAT. § 110.303 *et seq.* (2014); 23 PA. CONS. STAT. § 7101 *et seq.* (2014); R.I. GEN. LAWS § 15-23.1-100 *et seq.* (2014); S.C. CODE ANN. § 63-17-2900 *et seq.* (2014); S.D. CODIFIED LAWS § 25-9B-101 *et seq.* (2014); TENN. CODE ANN. § 36-5-2001 *et seq.* (2014); TEX. FAM. CODE ANN.

(continued...)

UIFSA allows parents to register and enforce child support orders issued by the tribunal of another state[4] in the same manner as orders issued by Alaska's courts.[5] It also allows parties to send the documents required to register another state's support order directly to the Alaska Child Support Services Division (CSSD), the arm of state government charged with enforcing child support orders.[6] CSSD enforces these orders through administrative procedures "without initially seeking to register the order."[7] UIFSA also includes procedures for direct enforcement of orders from other tribunals. Income withholding orders can be sent directly to obligors' employers in Alaska without first registering the orders with the state courts or CSSD.[8] When an employer receives a facially regular order from another state, the employer must comply and withhold the income as directed, just as if the order had come from an Alaska court.[9]

Whether the out-of-state child support order is registered with Alaska's courts, enforced by CSSD without court involvement, or sent directly to an employer,

---

[3](...continued)
§ 159.001 *et seq.* (West 2014); UTAH CODE ANN. § 78b-14-101 *et seq.* (LexisNexis 2014); VT. STAT. ANN. tit. 15B, § 101 *et seq.* (2014); VA. CODE ANN. § 20-88.32 *et seq.* (2014); WASH. REV. CODE § 26.21a.005 *et seq.* (2014); W. VA. CODE § 48-16-101 *et seq.* (2014); WIS. STAT. § 769.101 *et seq.* (2014); WYO. STAT. ANN. § 20-4-139 *et seq.* (2014).

[4]     AS 25.25.601-.602.

[5]     AS 25.25.603(b).

[6]     *See* AS 25.27.080.

[7]     AS 25.25.507(b).

[8]     *See* AS 25.25.501.

[9]     *See* AS 25.25.502(b).

an obligor can contest its validity or enforcement.[10]  The party contesting an order has the burden of proving one of several available defenses, including that "the issuing tribunal lacked personal jurisdiction over the contesting party," and that "there is a defense under the law of this state to the remedy sought."[11]

UIFSA applies to support orders "issued in another state."[12] As originally enacted in 1995, Alaska's version of UIFSA differed from the model version by not including Indian tribes within its definition of "state."[13]  In 2008 the State twice requested that the federal Department of Health and Human Services exempt it from the requirement that states enact UIFSA exactly as the model legislation was written.  Both requests were denied.  In 2009 the State legislature amended AS 25.25.101 to include Indian tribes in its definition of "state."[14]  As Alaska's version of UIFSA now reads, "the term 'state' includes an Indian nation or tribe."[15]

The law amending the statute included the legislature's view that "UIFSA does not determine the authority of an Indian tribe to enter, modify, or enforce a child

---

[10]     AS 25.25.506 (allowing an obligor to contest directly enforced orders); AS 25.25.606 (procedure to contest registered orders).

[11]     AS 25.25.607(a)(1), (5).

[12]     *See* AS 25.25.507, .601; *see also* AS 25.25.101(14) (" '[I]ssuing tribunal' means the tribunal of a state or foreign country that issues a support order or a judgment determining parentage of a child.").

[13]     *See* ch. 57, § 4, SLA 1995 (omitting Indian tribes).

[14]     Ch. 45, § 3, SLA 2009.

[15]     AS 25.25.101(26).

support order."[16] It went on to state that

> the legislative intent is
>
> (1)    to remain neutral on the issue of the underlying child support jurisdiction, if any, for the entities listed in the amended definition of "state";
>
> (2)    not to expand or restrict the child support jurisdiction, if any, of the listed "state" entities in the amended definition; and
>
> (3)    not to assume or express any opinion about whether those entities have child support jurisdiction in fact or in law.[17]

## B.    The Central Council Of Tlingit And Haida Indian Tribes Of Alaska's Tribal Child Support Unit

The Central Council of Tlingit and Haida Indian Tribes of Alaska ("Central Council" or "the Tribe") is a federally recognized Indian tribe based in Southeast Alaska.[18] Central Council has established a tribal court system asserting jurisdiction over civil, criminal, probate, and juvenile law matters.[19] Central Council also has a child support enforcement program known as the Tribal Child Support Unit. The Unit was first initiated in 2004, and it received full federal funding as Alaska's first Tribal IV-D program in 2007.

---

[16]    Ch. 45, § 1, SLA 2009.

[17]    *Id.*

[18]    Indian Entities Recognized and Eligible to Receive Services From the United States Bureau of Indian Affairs, 79 Fed. Reg. 4748-02, 4752 (Jan. 29, 2014).

[19]    Central Council of Tlingit & Haida Indian Tribes of Alaska Tribal Code, § 06.01.020.

Tribal IV-D programs are federally funded child support enforcement programs.[20] The federal government reimburses Tribal IV-D programs that comply with federal statutory and regulatory requirements for much of the cost of enforcing child support orders, just as it does for states' child support enforcement programs. One of these requirements is that any potential Tribal IV-D program describe "the population subject to the jurisdiction of the Tribal court or administrative agency for child support enforcement purposes."[21] Another is that each Tribal IV-D program "[e]stablish one set of child support guidelines by law or action of the tribunal for setting and modifying child support obligation amounts."[22]

Central Council's Tribal IV-D plan for the Tribal Child Support Unit grounds the jurisdiction of the tribal court in the Central Council Constitution and bylaws. Those bylaws first include the following statement of jurisdiction: "The jurisdiction of the Tribal Court shall include all territory described in Article 1 of the [Central Council] Constitution and it shall be over all persons therein, and any enrolled Tribal member citizen and their descendants wherever they are located."[23] The bylaws

---

[20]    *See* Tribal Child Support Enforcement Programs, 69 Fed. Reg. 16,638-82 (Mar. 30, 2004) (codified at 45 C.F.R. pts. 286, 302, 309, and 310). The designation "IV-D" is a reference to Title IV-D of the Social Security Act, codified at 42 U.S.C. §§ 651-669b (2012), the federal law that governs the federal government's reimbursement of child support enforcement costs.

[21]    45 C.F.R. § 309.70 (2015).

[22]    45 C.F.R. § 309.105(a)(1).

[23]    Central Council of Tlingit & Haida Indian Tribes of Alaska Tribal Code, § 06.01.020(A). The territory described in Article I of the tribal constitution includes lands within the Tribe's dependent communities and tribal trust lands. CONST. OF THE CENTRAL COUNCIL OF TLINGIT & HAIDA INDIAN TRIBES OF ALASKA art. I, § 1.

further include a list of actions subjecting individuals to tribal jurisdiction.[24] It is under this provision, rather than the provision for territorial jurisdiction, that Central Council asserts jurisdiction here. In its Tribal IV-D plan, Central Council explains that "[t]here are a number of criteria that the Court can rely on to exert its jurisdiction, which include sexual conduct which results in the paternity of a [Central Council] child and the corresponding obligation to provide for the child."

Central Council's Tribal IV-D plan for the Tribal Child Support Unit also describes the guidelines the tribal court uses to set child support obligations. The guidelines enact a percentage-based formula that establishes the amount of an obligor's child support obligation based on adjusted income and number of children. The guidelines also foresee certain deviations for low-income obligors, for in-kind support, and for other causes.

Since the Tribal Child Support Unit began its operations in 2007, Central Council's tribal courts have heard and decided more than 100 child support cases. In each case the child was a member of the Tribe, eligible for membership, or part of a family that had received Temporary Assistance to Needy Families benefits from Central Council, resulting in assignment of the right to child support to the Tribe. Central Council's courts have enforced child support obligations over the jurisdictional objections of obligor parents who are neither members of the Tribe nor eligible for membership.

The Tribal Child Support Unit has worked with its state counterpart, CSSD, since 2007. CSSD has referred more than 700 existing child support cases to the Unit for enforcement. CSSD has also enforced cases that the Unit referred to it, so long as the original child support order was issued by a state court rather than an Alaska tribal court.

---

[24]     *Id.* at § 06.01.030.

CSSD has not enforced any child support orders that Central Council's tribal courts originally issued. Only a state can garnish IRS tax refunds of obligor parents, and the Unit has coordinated with the State of Washington to do so. But certain other enforcement mechanisms, including garnishing an obligor parent's Alaska unemployment insurance benefits or Permanent Fund Dividend, require CSSD's cooperation and thus have been unavailable for enforcement of any child support orders issued by Central Council's tribal courts.

### C. Proceedings Below

In January 2010 Central Council filed a complaint against the State seeking a declaration that it possesses inherent jurisdiction to decide child support cases for member and member-eligible children and an injunction directing the State to enforce child support orders issued by its tribal courts. Both parties moved for summary judgment.

The superior court granted summary judgment for the Tribe. The superior court determined that "the issues of child custody and child support are closely intertwined." It grounded this connection between custody and support in two sources of Alaska law: first, *McCaffery v. Green*, a 1997 case in which we held that an Alaska trial court with jurisdiction to modify an out-of-state custody order also had jurisdiction to modify support obligations;[25] and second, the provisions of Alaska Civil Rule 90.3, which the superior court interpreted to "require [a trial] court to consider child support any time it makes a custody decision." The superior court also noted that rejecting Central Council's assertion of jurisdiction to set child support orders "would provide a substantial deterrent for parents to bring custody disputes to tribal courts, since tribal courts could not decide all of the issues in the case."

---

[25] *See* 931 P.2d 407, 414 (Alaska 1997).

In light of the connection between child custody and child support, and relying on our holding in *John v. Baker (John I)* that Alaska tribes have inherent sovereign jurisdiction to adjudicate child custody matters,[26] the superior court ruled that Central Council's jurisdiction extended to child support adjudication as well:

> The determination and enforcement of the duty of parents to support a child who happens to be a tribal member is no less a part of the tribe's internal domestic relations than the decision as to which parent the child will live with, which school the child will attend, or any of the other important decisions that custody courts make every day. Ensuring that tribal children are supported by their noncustodial parents may be the same thing as ensuring that those children are fed, clothed, and sheltered. The future of a tribe — like that of any society — requires no less.

The superior court entered an order "declaring that the Tribe's inherent rights of self-governance include subject matter jurisdiction to adjudicate child support for children who are members of the Tribe or eligible for Tribal membership." The order also required the State to treat Central Council's tribal courts and the Tribal Child Support Unit as it would any other state's courts and child support enforcement agency under UIFSA and the regulations connected to Title IV-D.

The superior court's order on summary judgment noted that Central Council's action for a declaratory judgment and injunctive relief did "not require the [superior] court to decide the issue of personal jurisdiction, which must be decided on a case by case basis." In some cases, the superior court speculated, "the exercise of jurisdiction by the tribal court may well violate due process." Ultimately, both parties

---

[26]     *See* 982 P.2d 738, 748-49 (Alaska 1999).

agreed "that the [superior] court should leave questions of personal jurisdiction for decision in future cases."

The State appeals.

## III.  STANDARD OF REVIEW

We review the scope of tribal jurisdiction de novo.[27]  We also "review a grant of summary judgment de novo, applying our independent judgment."[28]  "Under de novo review, we apply 'the rule of law that is most persuasive in light of precedent, reason, and policy.' "[29]

## IV.  DISCUSSION

UIFSA requires that Alaska courts register and CSSD enforce child support orders issued by the tribunal of "an Indian nation or tribe."[30]  Central Council does not argue that either Title IV-D of the Social Security Act or UIFSA is the source of its tribunals' authority to decide child support matters.  Instead, the legal question presented in this appeal is whether Central Council's tribal courts have inherent sovereign authority to exercise subject matter jurisdiction over child support matters and thus are "authorized tribunals" for purposes of UIFSA.

---

[27]     *See State v. Native Village of Tanana*, 249 P.3d 734, 737 (Alaska 2011).

[28]     *Estate of Kim ex rel. Alexander v. Coxe*, 295 P.3d 380, 385 (Alaska 2013).

[29]     *Native Village of Tanana*, 249 P.3d at 737 (quoting *Glamann v. Kirk*, 29 P.3d 255, 259 (Alaska 2001)).

[30]     AS 25.25.101(14), (26).

### A. Subject Matter Jurisdiction Derived From Inherent, Non-Territorial Sovereignty Has Two Dimensions.

The jurisdictional reach of tribal courts is a question of federal law.[31] As the United States Supreme Court has long recognized, "Indian tribes are unique aggregations possessing attributes of sovereignty over both their members and their territory."[32] In most states there is a "traditional reservation-based structure of tribal life,"[33] and many tribes consequently look to both tribal membership and tribal land as their sources of sovereignty and tribal court jurisdiction.[34] But a 1971 federal law known as the Alaska Native Claims Settlement Act (ANCSA) extinguished all Native claims to land in Alaska and revoked all but one Indian reservation in the state.[35] The United States Supreme Court has held that the former reservation lands ANCSA transferred to

---

[31]     *See Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316, 324 (2008).

[32]     *United States v. Mazurie*, 419 U.S. 544, 557 (1975).

[33]     *John I*, 982 P.2d 738, 754 (Alaska 1999).

[34]     *See, e.g.*, CONST. OF THE BLUE LAKE RANCHERIA art. II, § 1 ("Territory and Jurisdiction. The jurisdiction of the tribe, . . . and its tribal courts shall extend to the following: (a) All lands, water and other resources within the exterior boundaries of the Blue Lake Rancheria, . . . (e) All tribal members, wherever located, to the fullest extent permitted by applicable Federal law."); CONST. OF THE LITTLE RIVER BAND OF OTTAWA art. I, § 2 ("Jurisdiction Distinguished From Territory. The Tribe's jurisdiction over its members and territory shall be exercised to the fullest extent consistent with this Constitution, the sovereign powers of the Tribe, and federal law."); CONST. OF THE SIPAYIK MEMBERS OF THE PASSAMAQUODDY TRIBE art. II, § 1 ("Scope. The authority of the government established by this Constitution shall extend over all Sipayik members of the Passamaquoddy Tribe and all persons, subjects, territory and property now or hereafter included within the jurisdiction of the Pleasant Point Reservation of the Passamaquoddy Tribe . . . .").

[35]     *See* 43 U.S.C. §§ 1603, 1618(a) (2012).

-12-                                                      7093

Native-owned, state-chartered regional and village corporations in exchange for extinguishing those claims are not "Indian country" under the federal statute that defines the term.[36]  As a result of this history, we have had to examine the inherent, non-territorial sovereignty of Indian tribes, a question of federal law that other "courts have not had occasion to tease apart."[37]

Our decisions analyzing the inherent, non-territorial subject matter jurisdiction of Alaska tribal courts have implicitly recognized two separate dimensions of this jurisdiction.  Both dimensions reflect our understanding that inherent, non-territorial subject matter jurisdiction derives from "a tribe's ability to retain fundamental powers of self-governance."[38]  The first dimension of this jurisdiction relates to the character of the legal question that the tribal court seeks to decide, while the second relates to the categories of individuals and families who might properly be brought before the tribal court.

Although our earlier decisions have not always clarified that inherent, non-territorial subject matter jurisdiction has the two dimensions we now expressly recognize, they have addressed both the character of the legal questions that tribal courts have adjudicative authority to decide and the populations subject to that authority.  In doing so, our decisions have aligned with the definition of subject matter jurisdiction

---

[36]      *See Alaska v. Native Village of Venetie Tribal Gov't*, 522 U.S. 520, 532-34 (1998) (interpreting 18 U.S.C. § 1151).

[37]      *John I*, 982 P.2d at 754; *cf. Kaltag Tribal Council v. Jackson*, 344 F. App'x 324, 325 (9th Cir. 2009) ("Reservation status is not a requirement of jurisdiction because '[a] Tribe's authority over its reservation or Indian country is incidental to its authority over its members.' " (quoting *Native Village of Venetie I.R.A. Council v. Alaska*, 944 F.2d 548, 559 n.12 (9th Cir. 1991))).

[38]      *John I*, 982 P.2d at 758.

advanced by a leading treatise on Indian law: "the ability of a court to hear a particular kind of case, either because it involves a particular subject matter or because it is brought by a particular type of plaintiff or against a particular type of defendant."[39]

Our foundational decision for the analysis of tribal courts' exercise of subject matter jurisdiction on the basis of inherent, non-territorial sovereignty is *John I.*[40] That case arose when a father who was a member of Northway Village filed a custody petition in the Northway tribal court and then, after the tribal court issued its custody order, filed an identical suit in state superior court.[41] Although the children's mother was not a member of Northway Village she "consented to Northway's jurisdiction" during the first suit and then moved to dismiss the superior court suit on the basis of the tribal court's order.[42]

In *John I* we examined the first dimension of tribal courts' inherent, non-territorial subject matter jurisdiction: the character of the legal question at issue. We surveyed federal decisions and recognized that "in determining whether tribes retain their sovereign powers, the United States Supreme Court looks to the character of the power that the tribe seeks to exercise, not merely the location of events."[43] We focused our analysis on whether adjudicating child custody matters — the power that the Northway Village tribal court sought to exercise in *John I* — was the type of legal question that falls within tribal courts' membership-based subject matter jurisdiction. We

---

[39] COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 7.01, at 597 (Nell Jessup Newton ed., 2012).

[40] 982 P.2d 738.

[41] *Id.* at 743.

[42] *Id.*

[43] *Id.* at 752.

characterized child custody as an "internal domestic matter[]"[44] that "lies at the core of sovereignty."[45] Based on our analysis of the rights at issue, we held "that the type of dispute before us today — an action for determination of custody of the children of a member of Northway Village — falls squarely within Northway's sovereign power to regulate the internal affairs of its members."[46]

We next turned to the second dimension of inherent, non-territorial subject matter jurisdiction: the categories of litigants whose disputes the tribal courts have authority to decide. We noted that "[b]ecause the tribe only has subject matter jurisdiction over the internal disputes of tribal members, it has the authority to determine custody only of children who are members or eligible for membership."[47] We explicitly recognized that the mother in *John I* was "not a member of Northway Village," but our remand order only directed the superior court to determine the *children's* eligibility for tribal membership.[48]

A later case more distinctly separated the two dimensions of inherent, non-territorial sovereignty by deciding only one of the dimensions and explicitly declining to reach the other. In *State v. Native Village of Tanana* a tribe sought declaratory and injunctive relief related to its sovereign authority to initiate child custody

---

[44]    *Id.* at 754.

[45]    *Id.* at 758.

[46]    *Id.* at 759.

[47]    *Id.*

[48]    *Id.* While the mother had consented to tribal jurisdiction, *id.* at 743, we emphasized that the key inquiry was the *children's* membership or membership-eligible status, *id.* at 759.

proceedings as the Indian Child Welfare Act (ICWA)[49] defines the term.[50] After analyzing our own cases, precedent from federal courts, and congressional actions, we concluded that tribes do have inherent sovereign jurisdiction and authority to initiate ICWA-defined child custody proceedings.[51]

Although we recognized this jurisdiction, we concluded that the record developed at trial did not contain "sufficient facts to make determinations about specific limitations on inherent tribal jurisdiction over ICWA-defined child custody proceedings."[52] The reach of the jurisdiction would depend on, among other things, "the proper exercise of *subject matter* and personal jurisdiction."[53] Among the "many issues" left explicitly undecided were "the extent of tribal jurisdiction over non-member parents of Indian children" and "the extent of tribal jurisdiction over Indian children or member parents who have limited or no contact with the tribe."[54]

Thus, our decision in *Tanana* analyzed the first dimension of the subject matter inquiry but not the second. By acknowledging that questions of subject matter jurisdiction remained unanswered even after holding that "tribes are not necessarily precluded from exercising inherent sovereign jurisdiction to initiate 'child custody

---

[49]    25 U.S.C. § 1901 *et seq.* (2012).

[50]    249 P.3d 734, 736 (Alaska 2011).

[51]    *See id.* at 751.

[52]    *Id.*

[53]    *Id.* at 752 (emphasis added).

[54]    *Id.*

proceedings' as ICWA defines that term,"[55] we recognized that there are more facets of subject matter jurisdiction than just the character of the legal question at issue. The categorical analysis of "the extent of tribal court jurisdiction over non-member parents of Indian children" was not necessarily reserved for a case-by-case determination, but it could not be decided on the record on appeal in that case.[56] A complete description of the inherent, non-territorial subject matter jurisdiction of tribal courts consists of both the types of legal questions those courts can properly hear and the categories of parties whose legal disputes those courts can properly resolve.

## B. Adjudicating Child Support Is Within Tribal Courts' Inherent, Non-Territorial Subject Matter Jurisdiction.

The superior court concluded that "[t]he determination and enforcement of the duty of parents to support a child" is an integral "part of the tribe's internal domestic relations," and is thus within Central Council's courts' inherent, non-territorial subject matter jurisdiction.[57] We agree, and we hold that the adjudication of child support

---

[55]    *Id.* at 736.

[56]    *Id.* at 752.

[57]    The superior court's order on summary judgment also examined the extent to which "the issues of child custody and child support are closely intertwined" and the potential for "procedural manipulation" if tribal courts have jurisdiction over one but not the other. This method of analyzing Central Council's inherent, non-territorial subject matter jurisdiction is inconsistent with the United States Supreme Court's statement that the sovereign authority of Indian tribes "does not vary depending on the desirability of a particular regulation." *Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316, 340 (2008). Tribal court jurisdiction over child support matters must be analyzed on its own merits rather than as an extension of the recognized jurisdiction over child custody matters. *See also John v. Baker* (*John III*), 125 P.3d 323, 326-27 (Alaska 2005) ("Given the plain language of *John I* and *John II*, it is clear that we believed that the custody and support matters were separate and that the transfer of the former to the
(continued...)

obligations is a component of a tribe's inherent power "to regulate domestic relations among members."[58]

We have held that tribes' powers of internal self-governance include the power to determine the custody of children of divorcing parents,[59] the power to accept transfer jurisdiction of ICWA-defined custody cases from state courts,[60] and the power to initiate child protection cases.[61] In each of the cases in which we have recognized these powers, we discussed a federal statute — ICWA[62] — which is not directly applicable to the question of child support now before us. Even in *John I*, an interparental custody dispute to which ICWA did not strictly apply,[63] we examined the statute as relevant evidence of Congress's intent.[64]

The United States Supreme Court has described ICWA as a reaction to "abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually

---

[57](...continued)
tribal court did not entail the transfer of the latter." (first citing *John I*, 982 P.2d 738 (Alaska 1999); then citing *John v. Baker* (*John II*), 30 P.3d 68 (Alaska 2001))).

[58]    *John I*, 982 P.2d at 758 (quoting *Montana v. United States*, 450 U.S. 544, 564 (1981)).

[59]    *See id.* at 759.

[60]    *See In re C.R.H.*, 29 P.3d 849, 852 (Alaska 2001).

[61]    *See Native Village of Tanana*, 249 P.3d at 736, 750-51.

[62]    25 U.S.C. § 1901 *et seq.* (2012).

[63]    *See John I*, 982 P.2d at 746-47.

[64]    *See id.* at 754 ("Although the custody dispute at the center of this case falls outside ICWA's scope, Congress's purpose in enacting ICWA reveals its intent that Alaska Native villages retain their power to adjudicate child custody disputes.").

in non-Indian homes."[65] Congress elected to address these practices by limiting state court jurisdiction and recognizing tribal court jurisdiction over ICWA-defined child custody matters.[66] Although the statute has provisions that establish the substantive law state courts are to apply — for example, a preference order for adoptive placements[67] — its primary means to enforce its provisions is an allocation of jurisdiction in ICWA-defined custody cases.

Congress has not suggested that similar practices exist or need to be addressed in the realm of child support. Although Congress gave the Secretary of the Department of Health and Human Services the authority to reimburse tribes for child support enforcement costs in 1996,[68] Title IV-D of the Social Security Act is a funding statute that does not purport to expand or otherwise alter its recipients' jurisdiction. Central Council's briefing before the superior court asserted that its jurisdiction to adjudicate child support is not tied to Title IV-D or to any other act of Congress.

Although ICWA was relevant to our earlier decisions on the subject matter jurisdiction of tribal courts, we have never suggested that it was the sole or even primary basis of that jurisdiction. Doing so would be inconsistent with the United States Supreme Court's pre-ICWA recognition of tribal court jurisdiction over custody

---

[65] *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 32 (1989).

[66] *See* 25 U.S.C. § 1911; *see also Native Village of Tanana*, 249 P.3d at 751 ("ICWA creates limitations on states' jurisdiction over ICWA-defined child custody proceedings, not limitations on tribes' jurisdiction over those proceedings."); *John I*, 982 P.2d at 753 ("ICWA's goal was to increase tribal control over custody decisions involving tribal children.").

[67] *See* 25 U.S.C. § 1915(a).

[68] *See* Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, § 375, 110 Stat. 2105 (1996).

matters.[69]  Instead, in *John I*, our examination of ICWA was in service of the point that an earlier statute, ANCSA, was not intended to "eradicate tribal court jurisdiction over family law matters."[70]  We "follow federal law by beginning from the premise that tribal sovereignty with respect to issues of tribal self-governance exists unless divested."[71]

At issue in both *John I* and this case is the *inherent* power of tribes "to conduct internal self-governance functions."[72]  Although child support is not governed by ICWA, as some child custody matters are, it is equally "a family law matter integral to tribal self-governance,"[73] and as such is part of the set of core sovereign powers that tribes retain.[74]  Moreover, "Congress's express finding in ICWA that 'there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children' "[75] is relevant to both child support and custody.

Child support orders are a pillar of domestic relations and are directly related to the well-being of the next generation.  As the superior court explained, "[e]nsuring that tribal children are supported by their noncustodial parents may be the

---

[69]    *See Fisher v. Dist. Ct. of the 16th Jud. Dist. of Mont.*, 424 U.S. 382, 389 (1976).

[70]    982 P.2d at 753.

[71]    *Id.* at 752; *see also id.* at 752-53 ("[W]e will not lightly find that Congress intended to eliminate the sovereign powers of Alaska tribes.").

[72]    *Id.* at 758.

[73]    *Id.*

[74]    *See Hepler v. Perkins*, 13 INDIAN L. REP. 6011, 6015 (Sitka Cmty. Ass'n Tribal Court, Apr. 7, 1986) ("Tribal jurisdiction to care for tribal children is simply not related to nor dependent on the legal status of any given parcel of land.").

[75]    *Simmonds v. Parks*, 329 P.3d 995, 1007 (Alaska 2014) (quoting 25 U.S.C. § 1901(3)).

same thing as ensuring that those children are fed, clothed, and sheltered. The future of a tribe — like that of any society — requires no less." "[A] tribe has a strong interest in 'preserving and protecting the Indian family as the wellspring of its own future,' "[76] and determining what resources a child will enjoy from her parents is a crucial aspect of promoting that interest. As the United States Court of Appeals for the Ninth Circuit has recognized, parental financial neglect of children "is a matter of vital importance to the community."[77]

Recognizing tribal courts' inherent, non-territorial subject matter jurisdiction over child support matters is consistent with our description of tribal power. Although our cases recognizing specific instances of that power have largely related to child custody, they are situated within the larger context of family affairs. In *John I* we recognized "the fundamental powers of tribes to adjudicate internal family law affairs like child custody disputes."[78] In *Tanana* we described *John I* as "foundational Alaska authority regarding Alaska Native tribal jurisdiction over the welfare of Indian children."[79] And in *Simmonds v. Parks* we reiterated that *John I* recognized "tribal sovereignty to decide cases involving the best interests of tribal children."[80] When child

---

[76]     *John I*, 982 P.2d at 752 (quoting H.R. REP. No. 95-1386, at 19 (1978)).

[77]     *United States v. Ballek*, 170 F.3d 871, 874 (9th Cir. 1999) (discussing the importance of child support obligations in concluding that child support awards may be enforced through imprisonment).

[78]     982 P.2d at 759.

[79]     *State v. Native Village of Tanana*, 249 P.3d 734, 750 (Alaska 2011).

[80]     329 P.3d at 1008.

support is ordered it is fundamental to its recipients' welfare and best interests and thus is "of vital and fundamental importance to tribal self-governance."[81]

The subsequent history of the *John v. Baker* litigation also weighs in favor of Central Council's assertion of subject matter jurisdiction over child support orders. In *John III* we considered the argument that our decision in *John I* implicitly recognized tribal court subject matter jurisdiction over not just child custody matters but also child support matters.[82] The posture of the case made it unnecessary for us to decide whether the tribal court in fact had the necessary jurisdiction to issue child support orders.[83] But we did discuss what qualities a tribal child support order would require to be "a recognizable child support order to which the [superior] court could extend comity."[84] Had the tribal court lacked subject matter jurisdiction to issue a child support order, this discussion of the proper contours of comity would have conflicted with our statement in *John I*'s comity analysis that "our courts should refrain from enforcing tribal court judgments if the tribal court lacked personal or subject matter jurisdiction."[85]

The actions of the federal executive branch also suggest that Central Council's tribal courts have inherent, non-territorial subject matter jurisdiction over child

---

[81]    *Id.*

[82]    *See John III*, 125 P.3d 323, 326 (Alaska 2005).

[83]    *See id.* at 324 ("We conclude that the superior court correctly ruled that child support had never been referred to the tribal court and that the division could enforce the court's child support order. This disposes of the case and makes it unnecessary to resolve the additional jurisdictional issues.").

[84]    *Id.* at 327; *see also id.* ("Although a tribal child support order need not match the format of a support order issued by the Alaska courts, it must, at a minimum, be concrete enough to be enforceable.").

[85]    982 P.2d 738, 763 (Alaska 1999).

support matters. The part of Title IV-D that makes Tribal IV-D programs like Central Council's eligible for federal reimbursement requires each applicant program to "demonstrate[] to the satisfaction of the Secretary [of the Department of Health and Human Services] that it has the capacity to operate a child support enforcement program meeting the objectives of this part, including . . . establishment, modification, and enforcement of support orders."[86] Similarly, the regulations enacted to govern Tribal IV-D eligibility require that all applicant programs include "a description of the population subject to the jurisdiction of the Tribal court or administrative agency for child support enforcement purposes."[87] Central Council's application identified its tribal court jurisdiction over child support matters as stemming from the tribal code and constitutional provisions that allow jurisdiction based on certain acts of affiliation with the Tribe, rather than asserting a territorial basis for jurisdiction. By accepting Central Council's application to make the Tribal Child Support Unit a Tribal IV-D program, the Secretary of the Department of Health and Human Services confirmed that this assertion of non-territorial jurisdiction over child support matters complies with the federal statutory and regulatory requirements for Tribal IV-D programs.

The State argues that the near certainty that state agencies will be involved with the enforcement of child support orders issued by tribal courts distinguishes this case from our previous decisions regarding child custody. The State maintains that requiring its state child support program, CSSD, to coordinate with many tribal courts will impose additional costs and disrupt the uniformity of child support awards.[88] In

---

[86]    42 U.S.C. § 655(f) (2012).

[87]    45 C.F.R. § 309.70 (2015).

[88]    We note that while coordination costs will no doubt increase, it is hardly
(continued...)

particular, the State points to the potential difficulty of modifying a tribal support order, which might prevent the State from recouping funds it spends on children in its custody who are subject to a tribal order.[89]

But these concerns do not limit the exercise of tribal court jurisdiction. Our decisions exploring the retained inherent self-governance powers of Alaska tribes contain no suggestion that the burden on state agencies associated with recognizing tribal authority is part of the analysis. The State's reliance on the United States Supreme Court's discussion of "considerable" state interests in *Nevada v. Hicks*[90] is inapposite. That case concerned "tribal authority to regulate state officers in executing process related to the violation, off reservation, of state laws."[91] The Supreme Court explicitly held that such authority "is not essential to tribal self-government or internal relations—

---

[88](...continued) clear that enforcement costs will similarly rise. Central Council's Tribal Child Support Unit distributed nearly $500,000 in child support collections in fiscal year 2012. OFFICE OF CHILD SUPPORT ENFORCEMENT, FY 2012 PRELIMINARY REPORT TO CONGRESS (2013), Tbl. P-37. Without the Unit it would have fallen to CSSD to distribute those same collections. To the extent that CSSD's enforcement costs may rise as a result of more tribal children and custodial parents having ready access to a tribunal that can adjudicate their child support disputes, those increased costs will reflect an increased realization of the role that CSSD already performs so admirably: serving Alaskan children.

[89]    UIFSA provides for modification of an out-of-state child support order only when: (1) all parties consent; (2) none of the parties reside in the issuing state, the party seeking modification "is not a resident of this state," and "the respondent is subject to the personal jurisdiction of the tribunal of this state;" or (3) "all of the individual parties reside in this state and the child does not reside in the issuing state." AS 25.25.611, .613. We do not have occasion in this case to decide how the statutory references to residence should be interpreted when the issuing tribunal exercises membership-based jurisdiction.

[90]    533 U.S. 353, 364 (2001).

[91]    *Id.*

to 'the right to make laws and be ruled by them.' "[92] This holding did not depend on the extent of the state's interest, but instead flowed from the Court's exploration of "what is necessary to protect tribal self-government and control internal relations."[93]

State agencies are also involved in enforcing child custody orders, and non-compliance with these orders can expose parents to criminal contempt charges and imprisonment.[94] And there is little doubt that child support enforcement frequently requires more routine and sustained contacts between a state enforcement agency and a noncustodial parent. But this does not make child support any less focused on "[t]he welfare of tribal children."[95] In both child custody and child support matters, the instruments of state government are employed as a means of enforcing duties that run between parents and children; their involvement does not transform the power at issue into one that is no longer concerned with internal domestic relations.

Ensuring that parents financially care for their children is a pillar of domestic relations and is directly related to the well-being of the next generation. Setting, modifying, and enforcing such obligations is one way that "[t]ribal courts play a vital role in tribal self-government."[96] We hold that tribal courts have inherent, non-territorial subject matter jurisdiction to adjudicate parents' child support obligations.

---

[92] *Id.* (citing *Strate v. A-1 Contractors*, 520 U.S. 438, 459 (1997)).

[93] *Id.* at 360; *see also Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, 154 (1980) ("[E]ven if the State's interests were implicated by the tribal taxes, a question we need not decide, it must be remembered that tribal sovereignty is dependent on, and subordinate to, only the Federal Government, not the States.").

[94] AS 09.50.010(5).

[95] *Simmonds v. Parks*, 329 P.3d 995, 1008 (Alaska 2014).

[96] *See Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 14 (1987).

**C.      Tribal Courts' Inherent, Non-Territorial Subject Matter Jurisdiction Over Child Support Reaches Nonmember Parents Of Children Who Are Tribal Members Or Are Eligible For Membership.**

In the State's briefing before the superior court it argued that jurisdiction over nonmembers is an issue of subject matter jurisdiction, not merely personal jurisdiction. In its briefing before this court and at oral argument the State urged us to address Central Council's subject matter jurisdiction over nonmembers. As discussed *supra* in Part IV.A, we agree that identifying the individuals and families who might properly be brought before a tribal court is a question of subject matter jurisdiction.[97] We also agree with the State that the issue is ripe for a decision, as the Tribe's complaint here asserted jurisdiction over all cases where the child is a member or is eligible for membership.[98] As the State noted at oral argument, that set of cases "necessarily includes" cases in which the child is a member or is membership-eligible but one parent is not. And the issue is far from being an abstract question: Central Council's tribal courts have already decided child support cases over the jurisdictional objections of obligor parents who are neither members of the Tribe nor eligible for tribal

_____

[97]      This analysis does not change when one parent is not a member of the tribe, notwithstanding any separate personal-jurisdiction challenges that a nonmember parent might raise.

[98]      Although the Tribe argued that we need not address the question of *personal* jurisdiction over nonmember parents, it took the position that the Tribe's subject matter jurisdiction depends only on the membership status of the child. Under this theory, the nonmember status of a parent is not a bar to subject matter jurisdiction. It also urged us to affirm the superior court's decision, which recognized the Tribe's subject matter jurisdiction over child support orders for tribal children without making an exception for nonmember parents.

membership.[99] Finally, as reflected in the parties' statements at oral argument, guidance from this court can resolve this long-standing question and allow the parties to move forward together in enforcing child support orders for the benefit of the Tribe's and the State's children.

### 1. Because child support jurisdiction is tied to a tribe's inherent sovereignty, *Montana v. United States* does not apply.

The State argues that the United States Supreme Court's decision in *Montana v. United States*[100] permits a tribe to regulate a nonmember only if the nonmember enters into a consensual business relationship with the tribe or its members or if the nonmember's conduct on land the tribe owns within a reservation imperils the very existence of the tribal community. The State contends that child support adjudication does not fit within either of these circumstances, and thus that Central Council cannot exercise subject matter jurisdiction over nonmember parents in child support cases.

We considered a similar argument in *Simmonds v. Parks*.[101] That case arose out of a tribal court order terminating the parental rights of a nonmember.[102] Rather than appeal the decision within the tribal court system, the nonmember father sought to regain

---

[99]      *Cf. State v. Native Village of Tanana*, 249 P.3d 734 (Alaska 2011) (noting "a number of *hypothetical* fact patterns raising difficult questions" about jurisdiction over parents, *id.* at 748, and the absence of "sufficient facts" to decide those questions, *id.* at 751, and therefore explicitly declining to decide "the extent of tribal jurisdiction over non-member parents of Indian children," *id.* at 752 (emphasis added)).

[100]      450 U.S. 544 (1981).

[101]      329 P.3d 995 (Alaska 2014).

[102]      *Id.* at 998.

custody of his daughter in state court.[103]  We adopted the federal exhaustion of tribal remedies doctrine and held that parties are not permitted to collaterally attack tribal court judgments unless they have exhausted all available appellate tribal court remedies or satisfy one of the recognized exceptions to the doctrine.[104]

In *Simmonds* the State intervened and argued that exhaustion was not required because the tribal court plainly lacked jurisdiction over nonmember parents of tribal children.[105]  The State's argument relied heavily on its understanding that *Montana* and a subsequent decision by the United States Supreme Court, *Strate v. A-1 Contractors*,[106] jointly created a presumption that tribal courts lacked jurisdiction in circumstances like the one then at issue.[107]

We rejected the State's argument and instead held that "tribal jurisdiction [over nonmember parents in parental rights termination proceedings] is, at the very least, colorable and plausible."[108]  We carefully examined the federal cases that the State contended created a presumption against jurisdiction and determined that those decisions were significantly more limited in scope than the State had acknowledged.  "The United States Supreme Court has repeatedly and explicitly emphasized the context-bound nature of each of its rulings on tribal court civil jurisdiction, looking to various indices of congressional and executive action and intent in enlarging or diminishing retained

---

[103]    *Id.*

[104]    *See id.* at 1011-14.

[105]    *See id.* at 1019.

[106]    520 U.S. 438 (1997).

[107]    *See Simmonds*, 329 P.3d at 1019.

[108]    *Id.* at 1017.

inherent tribal sovereignty."[109]   The question of tribal court jurisdiction over parental rights termination proceedings significantly differed from the land management issues at play in *Montana*; no decision from any court had held that *Montana* prevented a tribal court from properly deciding a child custody proceeding involving nonmembers.[110] Given the readily apparent distinctions between the legal authority exercised by the tribal court in *Simmonds* and that at issue in *Montana* and other cases, we concluded that the tribal court's claim to jurisdiction was both colorable and plausible, and therefore that the nonmember had not been excused from the requirement that he exhaust tribal appellate remedies before launching a collateral attack in state court.[111]

In *Simmonds* we were only charged with determining whether the tribal court's claim to jurisdiction over a nonmember parent on the basis of a child's membership or eligibility for membership was colorable or plausible.[112]   This case, in contrast, requires that we decide whether tribal courts' inherent, non-territorial subject matter jurisdiction does in fact extend to the adjudication of the child support rights and obligations of nonmember parents of children who are members or eligible for membership.  We hold that because tribes' inherent authority over child support stems from their power over family law matters concerning the welfare of Indian children — an area of law that is integral to tribal self-governance — the basis and limits of that authority are tied to the child rather than the parent.

---

[109]   *Id.* at 1019.

[110]   *See id.* at 1021-22.

[111]   *See id.* at 1022.

[112]   *See id.*; *see also Atwood v. Fort Peck Tribal Court Assiniboine*, 513 F.3d 943, 948 (9th Cir. 2008) (noting that exhaustion of tribal court remedies in a custody dispute was not excused because "[a]lthough the rights of non-member Plaintiff are affected, it is not clear that that fact alone would strip the Tribal Court of jurisdiction").

In this appeal, the State once again argues that *Montana* dictates the outcome in this case and precludes subject matter jurisdiction over nonmember parents. *Montana* is a case about the power of a tribe to regulate "hunting and fishing by nonmembers of a tribe on lands no longer owned by the tribe."[113] The Supreme Court held that such regulation could not be sustained "as an incident of the inherent sovereignty of the Tribe over the entire Crow Reservation."[114] The Court announced "the general proposition that the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe,"[115] and then identified what have come to be known as "the *Montana* exceptions"[116] to this proposition:

> A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements. A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.[117]

The Supreme Court has clarified that "[t]hese exceptions are 'limited' ones, and cannot be construed in a manner that would 'swallow the rule' or 'severely shrink' it."[118]

---

[113]   *See Montana v. United States*, 450 U.S. 544, 564 (1981).

[114]   *Id.* at 563.

[115]   *Id.* at 565.

[116]   *E.g.*, *Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316, 330 (2008).

[117]   *Montana*, 450 U.S. at 565-66 (citations omitted).

[118]   *Plains Commerce*, 554 U.S. at 330 (first quoting *Atkinson Trading Co. v.*

(continued...)

"While the *Montana* Court stated its 'general proposition' in categorical terms, its actual conclusion depended on its examination of federal executive and legislative action and intent regarding the regulation at issue."[119] The *Montana* Court described the regulatory issue before it as "a narrow one."[120] The Supreme Court has subsequently held that determining the "existence and extent" of a tribal court's civil jurisdiction "will require a careful examination of tribal sovereignty, the extent to which that sovereignty has been altered, divested, or diminished, as well as a detailed study of relevant statutes, Executive Branch policy as embodied in treaties and elsewhere, and administrative or judicial decisions."[121] It has also called for "a proper balancing" of the interests of tribes and nonmember litigants.[122] Justice O'Connor, in a concurring opinion, noted that the holding in *Montana* and its progeny "that tribal jurisdiction must 'accommodat[e]' various sovereign interests does not mean that tribal interests are to be nullified through a per se rule."[123]

Moreover, it is important to consider the source of tribal authority that *Montana* and ensuing cases have analyzed, because it critically differs from the source

---

[118](...continued)
*Shirley*, 532 U.S. 645, 647, 655 (2001); then quoting *Strate v. A-1 Contractors*, 520 U.S. 438, 458 (1997)).

[119]     *Simmonds v. Parks*, 329 P.3d 995, 1020 (Alaska 2014) (citing *Montana*, 450 U.S. at 557-63).

[120]     *Montana*, 450 U.S. at 557.

[121]     *Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 855-56 (1985) (citation omitted).

[122]     *Nevada v. Hicks*, 533 U.S. 353, 374 (2001).

[123]     *Id.* at 395 (O'Connor, J., concurring in part) (alteration in original) (quoting *Washington v. Confederated Tribes of Colville Reservation*, 447 U.S. 134, 156 (1980)).

of authority at issue here. "Indian tribes are unique aggregations possessing attributes of sovereignty over both their members and their territory."[124] The authority Central Council invokes in this appeal stems from its sovereignty over its members. In contrast, the *Montana* Court analyzed the breadth "of the inherent sovereignty of the Tribe *over the entire Crow Reservation*"[125] — a distinctly territorial basis of sovereignty. The Supreme Court's later statements regarding the reach of tribal court jurisdiction have similarly arisen in cases in which tribes invoked authority based on territory.[126] Translating the *Montana* Court's analysis from the context in which it was delivered to that of this appeal is not the simple matter the State portrays it to be, but instead requires understanding how the limits of land-based sovereignty are related to its territorial basis, and thus what similar limits may exist on inherent sovereignty based on tribal membership.

The Ninth Circuit considered the applicability of the *Montana* rule and the proper application of the *Montana* exceptions with regard to territorial sovereignty in a 2011 case, *Water Wheel Camp Recreational Area, Inc. v. LaRance*.[127] In *Water Wheel* a tribal court exercised jurisdiction over claims arising from the tribe's lease of tribal

---

[124]     *United States v. Mazurie*, 419 U.S. 544, 557 (1975); *cf. John I*, 982 P.2d 738, 759 (Alaska 1999) ("The federal decisions contain language supporting the existence of tribal sovereignty based on either land or tribal status.").

[125]     *Montana*, 450 U.S. at 563 (emphasis added).

[126]     *See, e.g.*, *Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316, 320-23 (2008) (contract and other claims arising out of sale of non-Indian fee land within reservation); *Hicks*, 533 U.S. at 356-57 (tort and civil rights claims arising out of search pursuant to state-issued warrant on tribal lands within reservation); *Strate v. A-1 Contractors*, 520 U.S. 438, 442 (1997) (tort claim arising out of accident on state highway within reservation).

[127]     642 F.3d 802 (9th Cir. 2011).

lands within a reservation to a non-Indian corporation owned by a non-Indian.[128] A federal district court determined that the tribal court had jurisdiction over the corporation under the "consensual relationship" *Montana* exception but rejected its assertion of jurisdiction over the owner personally.[129]

The Ninth Circuit reversed and held that the district court had "appl[ied] *Montana* unnecessarily."[130] It noted that "the Supreme Court has on only one occasion established an exception to the general rule that *Montana* does not apply to jurisdictional questions arising from the tribe's authority to exclude non-Indians from tribal land."[131] That sole exception, *Nevada v. Hicks*, concerned "tribal-court jurisdiction over state officers enforcing state law," who are "a narrow category of outsiders" whose liability is of special state interest.[132] And even *Hicks* "explicitly recognized that in some cases, land ownership 'may sometimes be a dispositive factor' in establishing a tribal court's regulatory jurisdiction over non-Indians."[133] Thus, the *Water Wheel* court concluded, "Supreme Court and Ninth Circuit precedent, as well as the principle that only Congress may limit a tribe's sovereign authority," all counseled in favor of applying *Montana* to jurisdictional questions arising on tribal land "only when the specific concerns at issue

---

[128]  *See id.* at 804-07.

[129]  *See Water Wheel Camp Recreational Area, Inc. v. LaRance*, No. 08-0474, 2009 WL 3089216, at *13 (D. Ariz. Sept. 23, 2009).

[130]  *Water Wheel Camp Recreational Area, Inc.*, 642 F.3d at 807 n.4.

[131]  *Id.* at 813.

[132]  *Id.* (quoting *Nevada v. Hicks*, 533 U.S. 353, 358 n.2, 371 (2001)).

[133]  *Id.* (quoting *Hicks*, 533 U.S. at 360).

in [*Hicks*] exist."[134]  Because the lease dispute in *Water Wheel* did not involve state law enforcement, "*Montana* [did] not apply to this case."[135]

*Water Wheel* warned against the rote expansion of *Montana* to cases that arise on tribal land and thus are closely tied to the territorial basis of inherent tribal sovereignty.[136]  The same care must be paid when tribal courts claim jurisdiction over matters that are closely tied to the membership basis of inherent tribal sovereignty.  As discussed in Part IV.B, *supra*, child support is a pillar of domestic relations and is directly related to the well-being of the next generation of tribal members.  Central Council does not claim general jurisdiction over nonmember parents, but rather asserts specific jurisdiction to adjudicate child support matters arising out of a parent's obligations to his or her tribal child, whose membership is the basis of inherent tribal

---

[134]     *Id.*

[135]     *Id.* at 816; *see also id.* at 813 ("[Applying *Montana*] would impermissibly broaden *Montana*'s scope beyond what any precedent requires and restrain tribal sovereign authority despite Congress's clearly stated federal interest in promoting tribal self-government.").

[136]     *See id.* at 812 n.7 ("Further bolstering our conclusion that the tribe has regulatory jurisdiction is the fact that this is an action to evict non-Indians who have violated their conditions of entry and trespassed on tribal land, directly implicating the tribe's sovereign interest in managing its own lands."); *see also Attorney's Process & Investigation Servs., Inc. v. Sac & Fox Tribe of Miss. in Iowa*, 609 F.3d 927, 940 (8th Cir. 2010) ("Tribal civil authority is at its zenith when the tribe seeks to enforce regulations stemming from its traditional powers as a landowner."); *cf. Montana v. United States*, 450 U.S. 544, 557 (1981) ("The Court of Appeals held that the Tribe may prohibit nonmembers from hunting or fishing on land belonging to the Tribe or held by the United States in trust for the Tribe, and with this holding we can readily agree.  We also agree with the Court of Appeals that if the Tribe permits nonmembers to fish or hunt on such lands, it may condition their entry by charging a fee or establishing bag and creel limits." (citation omitted)).

sovereignty. The jurisdiction claimed is thus intimately tied to the identified basis of inherent tribal sovereignty. *Montana* does not apply to this case.

## 2. An alternative analysis under the *Montana* exceptions would also allow a tribe to exercise jurisdiction.

Even if *Montana* did apply, Central Council's exercise of subject matter jurisdiction over nonmember parents would fit within either of its two exceptions. The first exception provides that "[a] tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements."[137] This "consensual relationship exception requires that the tax or regulation imposed by the Indian tribe have a nexus to the consensual relationship itself."[138] The "consent may be established 'expressly or by [the nonmember's] actions.' "[139]

Contrary to the State's argument, even in territory-based sovereignty cases the exception applies to more than just business relationships. As described in *Montana* it encompasses "other arrangements,"[140] which, as the Supreme Court later clarified in *Hicks*, refer to "private consensual relationship[s]."[141] In *Smith v. Salish Kootenai College* the Ninth Circuit, sitting en banc, recognized that the exception can

---

[137]     *Montana*, 450 U.S. at 565.

[138]     *Atkinson Trading Co. v. Shirley*, 532 U.S. 645, 656 (2001).

[139]     *Water Wheel*, 642 F.3d at 818 (alteration in original) (quoting *Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316, 337 (2008)).

[140]     *Montana*, 450 U.S. at 565.

[141]     533 U.S. 353, 359 n.3 (2001).

reach consensual bonds that do not involve a business relationship.[142]  The *Smith* court expressly rejected the suggestion that the first *Montana* exception is limited to commercial arrangements and instead explained that, in its view, "the Court's list in *Montana* is illustrative rather than exclusive."[143]  And in *Water Wheel* the Ninth Circuit further explained that tribal court jurisdiction under the first *Montana* exception "depends on what non-Indians 'reasonably' should 'anticipate' from their dealings with a tribe or tribal members on a reservation."[144]

A relationship that leads to the birth of a child is one that has significant consequences and obligations.  When two people bring a child into being each should reasonably anticipate that they will be required to care for the child and perhaps may need to turn to a court to establish the precise rights and responsibilities associated with the resulting family relationship.  This may require litigating in a court that is tied to the child but with which the parent has more limited contacts.[145]  As applied to the broad category of nonmember parents, such events are, in at least some circumstances,

---

[142]    434 F.3d 1127, 1140-41 (9th Cir. 2006) (en banc).

[143]    *Id.* at 1137 n.4.

[144]    *Water Wheel*, 642 F.3d at 817 (quoting *Plains Commerce*, 554 U.S. at 338); *see also id.* at 818 ("We are to consider the circumstances and whether under those circumstances the non-Indian defendant should have reasonably anticipated that his interactions might trigger tribal authority.").

[145]    *See, e.g.*, AS 25.30.300(a)(1) (courts in a child's home state have jurisdiction to make initial child custody determinations); AS 25.25.201(6) (courts may exercise personal jurisdiction over nonresidents in child support matters if, among other bases, the nonresident "engaged in sexual intercourse in this state and the child may have been conceived by that act of intercourse"); *Parker v. State, Dep't of Revenue, Child Support Enf't Div., ex rel. R.A.W.*, 960 P.2d 586, 588 (Alaska 1998) (upholding state court personal jurisdiction to establish paternity and child support obligations of a nonresident who conceived a child with an Alaska resident in Alaska).

reasonably foreseeable.[146]   In the context of membership-based inherent tribal sovereignty, relationships that give rise to the birth of a child fit within the first *Montana* exception.

The second *Montana* exception provides that "[a] tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe."[147]  "The conduct must do more than injure the tribe, it must 'imperil the subsistence' of the tribal community."[148]

Although the United States Supreme Court "has never found the second exception applicable,"[149] the lower federal courts have.  In *Elliott v. White Mountain Apache Tribal Court* the Ninth Circuit held that a tribal court did not plainly lack jurisdiction over a civil action that the tribe brought against a nonmember arising out of a fire she had set on tribal land within the tribe's reservation.[150]  The court decided that the tribal court's claim to jurisdiction under the second *Montana* exception was "compelling . . . particularly in light of the result of the alleged violations of those regulations in this very case:  the destruction of millions of dollars of the tribe's natural

---

[146]     As discussed in Part IV.D, *infra*, our decision in this appeal is only concerned with tribal court subject matter jurisdiction over nonmember parents as a category.  We offer no opinion on the proper contours of personal jurisdiction.

[147]     *Montana v. United States*, 450 U.S. 544, 566 (1981).

[148]     *Plains Commerce*, 554 U.S. at 341 (quoting *Montana*, 450 U.S. at 566).

[149]     CONFERENCE OF W. ATT'YS GEN., AMERICAN INDIAN LAW DESKBOOK 209 (Clay Smith ed., 4th ed. 2008).

[150]     *See* 566 F.3d 842, 844-45 (9th Cir. 2009).

resources."[151] The Eighth Circuit, in *Attorney's Process & Investigation Services, Inc. v. Sac & Fox Tribe of Mississippi in Iowa*, similarly looked to the magnitude of the alleged violation in holding that tort actions arising from an attempted physical takeover of a tribal casino fit within the second *Montana* exception.[152] And in *Water Wheel* the Ninth Circuit held that even if *Montana* applied, the fact that "the commercial dealings between the tribe and [the non-Indian owner] involved the use of tribal land, one of the tribe's most valuable assets," would fit the action within the second *Montana* exception.[153]

In light of these precedents we have no difficulty holding that the adjudication of child support obligations owed to tribal children falls within the second *Montana* exception. Congress has explicitly found "that there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children."[154] And as the superior court correctly recognized, "[e]nsuring that tribal children are supported by their noncustodial parents may be the same thing as ensuring that those children are fed, clothed, and sheltered. The future of a tribe — like that of any society — requires no less." In light of federal precedent that recognizes that serious damage to territorial resources fits within the second *Montana* exception when a tribe's inherent sovereignty is based on territory, the serious potential for damage to the next generation of tribal members posed by a tribe's inability to administer parental financial support of member

---

[151]    *Id.* at 850.

[152]    *See* 609 F.3d 927, 939 (8th Cir. 2010).

[153]    *Water Wheel Camp Recreational Area, Inc. v. LaRance*, 642 F.3d 802, 818 (9th Cir. 2011).

[154]    25 U.S.C. § 1901(3) (2012).

or member-eligible children brings the power to set nonmember parents' child support obligations within the retained powers of membership-based inherent tribal sovereignty.

In addition to complying with federal judicial precedent, our recognition of Central Council's jurisdiction over nonmember parents in the child support realm also complies with the federal executive branch's determinations. As discussed above, the Secretary of the Department of Health and Human Services had to approve Central Council's application to make the Tribal Child Support Unit a Tribal IV-D program, and by federal regulation that plan had to include "a description of the population subject to the jurisdiction of the Tribal court or administrative agency for child support enforcement purposes."[155] Central Council's application asserted jurisdiction on, among other things, the basis of "sexual conduct which results in the paternity of a [Central Council] child and the corresponding obligation to provide for the child." By approving Central Council's application, the Secretary implicitly recognized that tribal courts' assertion of subject matter jurisdiction over nonmember parents complied with the federal statutory and regulatory requirements for Tribal IV-D programs.

The holding we announce today comports with our previous decisions on the inherent, non-territorial subject matter jurisdiction of tribal courts. In *John I* we held that "[a] tribe's inherent sovereignty to adjudicate internal domestic custody matters depends on the membership or eligibility for membership of the child."[156] Whether the children whose custody was at issue were in fact eligible for tribal membership was contested, and we determined that their eligibility was "a critical fact that must be

---

[155]   45 C.F.R. § 309.70 (2015).

[156]   982 P.2d 738, 759 (Alaska 1999).

determined by the superior court on remand."[157] On remand, the superior court "concluded that the children were eligible for membership." In our view, the superior court "correctly determined that [the tribe] had subject matter jurisdiction."[158]

Our "focus on the tribal affiliation of the children"[159] in *John I* did not reflect any confusion over the membership status of the parents. To the contrary, we repeatedly noted that "John is not a member of Northway Village."[160] We also noted that John "consented to Northway's jurisdiction."[161] Our recognition of this fact was critical because "subject matter jurisdiction is a threshold determination and prerequisite for a court to hear a case;"[162] it "cannot be waived" by a party's consent.[163] If the subject matter jurisdiction of a tribal court to hear a custody proceeding turned on the tribal affiliation of both parents rather than the child, the issue was squarely before us in *John I*, and we failed to fulfill our duty as a court to raise the issue ourselves.[164] That is not what happened. Instead, we recognized in *John I* that a parent's membership status

---

[157] *Id.*

[158] *John II*, 30 P.3d 68, 73 (Alaska 2001).

[159] *John I*, 982 P.2d at 759.

[160] *Id.*; *see also id.* at 743 ("Anita John, the children's mother and a member of Mentasta Village, consented to Northway's jurisdiction.").

[161] *Id.* at 743.

[162] *Hawkins v. Attatayuk*, 322 P.3d 891, 894 (Alaska 2014).

[163] *Id.* (quoting *Robertson v. Riplett*, 194 P.3d 382, 386 (Alaska 2008)).

[164] *See id.* at 894-95 ("The issue of subject matter jurisdiction 'may be raised at any stage of the litigation and if noticed must be raised by the court if not raised by one of the parties.' " (quoting *Hydaburg Coop. Ass'n v. Hydaburg Fisheries*, 925 P.3d 246, 248 (Alaska 1996))).

does not limit the tribal court's subject matter jurisdiction over the custody of tribal children. In both custody matters like that before us in *John I* and the child support matters like that before us today, tribal courts' inherent, non-territorial subject matter jurisdiction "depends on the membership or eligibility for membership of the child."[165]

Federal courts that have examined whether nonmember parents fall within tribal courts' inherent, non-territorial subject matter jurisdiction have reached the same conclusion. In *Kaltag Tribal Council v. Jackson*, the federal district court addressed the argument that a tribe's inherent sovereignty only extended to domestic disputes in which all parties are members of the tribe.[166] It rejected that argument, and instead held that "it is the membership of the child that is controlling, not the membership of the individual parents."[167] The Ninth Circuit affirmed,[168] and we reach the same conclusion in today's opinion.

"We have previously emphasized respect for tribal courts, and this respect must inform our analysis."[169] We are sympathetic to the concerns that nonmember parents may have about contesting their child support rights and obligations in a court system that may be less familiar to them than the state courts. But tribal courts that take on this responsibility share the goals of state courts and parents everywhere: They are, as Central Council's child support enforcement agency states in the first sentence of its governing policy guide, "motivated and dedicated to bettering the future of our children."

---

[165] *John I*, 982 P.2d at 759.

[166] No. 3:06–cv–211, 2008 WL 9434481 (D. Alaska Feb. 22, 2008), *aff'd*, 344 F. App'x 324 (9th Cir. 2009).

[167] *Id.* at *6.

[168] *Kaltag Tribal Council v. Jackson*, 344 F. App'x 324 (9th Cir. 2009).

[169] *Simmonds v. Parks*, 329 P.3d 995, 1011 (Alaska 2014).

And what was true in 1999, when *John I* was decided, remains true today: "Recognizing the ability and power of tribes to resolve internal disputes in their own forums, while preserving the right of access to state courts, can only help in the administration of justice for all."[170]

**D.    This Appeal Does Not Present Questions Of Personal Jurisdiction.**

The superior court's order granting Central Council summary judgment discussed the possibility that in some cases, "the exercise of [personal] jurisdiction by the tribal court may well violate due process," citing the United States Supreme Court's decision in *Kulko v. Superior Court*.[171]  However, it found it unnecessary "to decide the precise outer limits of the [tribal] court's jurisdiction," and the declaratory judgment and permanent injunction it issued did not address questions of personal jurisdiction.  Both Central Council and the State submitted that these issues should be left "for decision in future cases."  We agree that the question whether a tribal court exercising inherent, non-territorial subject matter jurisdiction has personal jurisdiction over the parties whose rights and obligations it adjudicates should be decided in cases presenting concrete factual records and a full opportunity to develop the factual and legal arguments.

**V.    CONCLUSION**

The superior court's order is AFFIRMED.

---

[170]    982 P.2d at 760.

[171]    436 U.S. 84, 91-92 (1978).

WINFREE, Justice, with whom STOWERS, Justice, joins, concurring in part.

The superior court made two legal rulings underlying the declaratory and injunctive relief entered in favor of the Central Council of Tlingit and Haida Indian Tribes of Alaska (the Tribe). First, relying on our seminal holding in *John v. Baker* that Alaska tribes retained non-territorial-based inherent sovereign authority to adjudicate custody disputes over children who are tribal members or eligible for tribal membership,[1] it ruled that this inherent sovereign authority encompassed adjudication of child support disputes over tribal children even if custody were not in dispute. Second, it concluded that with respect to child support orders issued by the Tribe, the State of Alaska was required to comply with the Uniform Interstate Family Support Act (UIFSA) and related federal and state regulations. Today the court affirms those legal rulings and the associated injunctive relief, and I join that part of its decision.

But the court unnecessarily moves further and reaches out to provide an advisory opinion[2] on yet another legal issue: whether a tribal court with non-territorial-based inherent sovereign authority to adjudicate matters involving tribal children necessarily has adjudicatory authority (subject to some unstated personal jurisdiction limitations) over non-tribal-member parents. This issue is not necessary to the decision before us, there is no specific controversy in this case necessitating a decision on the issue, there is no party in this case truly advocating for the interests of non-member

---

[1]     982 P.2d 738, 748-49 (Alaska 1999).

[2]     *Cf. Laverty v. Alaska R.R. Corp.*, 13 P.3d 725, 729 (Alaska 2000) (noting Alaska's Declaratory Judgment Act (AS 22.10.020(g)) does "not open the door for hypothetical adjudications [or] advisory opinions").

parents on the issue, and neither the Tribe nor the United States considered the issue worthy of significant briefing; I therefore do not join the court's advisory opinion.[3]

I start with the basic proposition that this case does not involve an actual child support dispute between the Tribe and a non-member parent based on an allegation that the Tribe lacked adjudicatory authority over the parent. This case involves the Tribe's demand that the State comply with UIFSA in connection with the Tribe's child support orders. The superior court recognized that under its ruling a tribal court "could claim jurisdiction" to enter a child support order against a non-member parent, but believed personal jurisdiction considerations would define the contours of a tribal court's authority and that further refinement was unnecessary at this time.

On appeal the State continues to argue that the Tribe does not have adjudicatory authority over non-member parents. The Tribe and the United States respond that this case does not raise any real dispute about tribal court adjudicatory authority over non-member parents and that the potential involvement of non-member parents in some cases does not divest the Tribe of its otherwise inherent sovereign authority to adjudicate child support for tribal children. I agree with the Tribe and the United States. And I find it ironic that they — albeit backhandedly — are willing to give non-member parents a future opportunity to be heard on the Tribe's adjudicatory authority while the court is so anxious to decide the issue today without ever hearing from a non-member parent.

---

[3]    If today's decision is not dictum, then it seems clear — at least under the court's interpretation of federal law — that whenever a tribal court has adjudicatory authority over a tribal or tribal-eligible child it automatically has adjudicatory authority over the child's non-member parent in any matter involving the child without regard to, or a required nexus with, Indian country.

This case comes to us much like *State v. Native Village of Tanana*,[4] involving the Indian Child Welfare Act (ICWA).[5] In that case we concluded that federally recognized Alaska Native tribes that had not reassumed exclusive adjudicatory jurisdiction still have concurrent jurisdiction to initiate ICWA-defined child custody proceedings — both inside and outside of Indian country — and are entitled to all the rights and privileges of Indian tribes under ICWA, including full faith and credit with respect to their ICWA-defined child custody orders.[6] But with an appropriate exercise of judicial restraint, we rejected the State's entreaty to more particularly define the contours of tribes' adjudicatory jurisdiction, including their adjudicatory authority over Indian children's[7] non-member parents:

> The nature and extent of tribal jurisdiction in any particular case will depend upon a number of factors, including but not limited to: (1) the extent of the federal recognition of a particular tribe as a sovereign; (2) the extent of the tribe's authority under its organic laws; (3) the tribe's delegation of authority to its tribal court; and (4) the proper exercise of subject matter and personal jurisdiction. Among the many issues we are not deciding today are: . . . (2) *the extent of tribal jurisdiction over non-member parents of Indian children*; and (3) the extent of tribal jurisdiction over Indian children or member parents who have limited or no contact with the tribe. We therefore do not need to address the varied hypothetical situations posited by the State as creating

---

[4]     249 P.3d 734 (Alaska 2011).

[5]     25 U.S.C. §§ 1901-1963 (2012).

[6]     *Native Vill. of Tanana*, 249 P.3d at 751.

[7]     *See* 25 U.S.C. § 1903(4) (defining "Indian child").

difficult jurisdictional questions — we leave those for later determinations under specific factual circumstances.[8]

I see no reason to dispense with this judicial restraint today.

The context of this case — a political jurisdictional battle between two sovereigns — provides an additional reason for judicial restraint. As outlined in *Native Village of Tanana*, the State's position on the nature and extent of tribal sovereignty has waxed and waned depending upon the politics of the day.[9] But jurisdictional battles between the State and Alaska Native tribes are inter-governmental and generally intended to delineate exclusive and concurrent jurisdiction boundaries and flesh out related concepts like full faith and credit for tribal court orders. In those battles — such as in this case and in *Native Village of Tanana* — the State and the tribes are the primary interested parties. Here, for example, the State's argument that the Tribe lacked any adjudicatory authority over non-members (with or without consent) to enter child support orders was not out of a concern about non-members forced to appear in tribal courts without consent, but rather out of a concern for its own budget — it simply did not want to have to enforce *any* of the Tribe's child support orders — and as a result of the litigation the State now will, *as a general matter*, have to enforce the Tribe's child support orders.

On the other hand, a specific non-member parent's objection to a tribal court's adjudicatory authority to issue a child support order would place the issue in a very different factual and legal context. It is not so clear to me that the State would be an interested party to that specific dispute although, like the United States often does in

---

[8] *Native Vill. of Tanana*, 249 P.3d at 751-52 (emphasis added). If today's decision is not dictum, then it seems clear the court now has answered the noted issue left open in that case.

[9] *Id.* at 744-47.

Indian jurisdictional disputes, the State could participate as an amicus curiae. And given Alaska's unique Indian law environment — where inherent sovereign authority is for the most part untethered to Indian country — existing U.S. Supreme Court precedents seem an imperfect roadmap for determining whether a tribal court has such adjudicatory authority.[10]

Perhaps this distinction can be made more clear with the following comments and questions. The choice to seek U.S. Supreme Court review of today's decision belongs solely to the State, not to a non-member parent of a tribal child. That decision — like all previous State decisions regarding tribal sovereignty — will be primarily a political decision, based on how the State wishes to co-exist with sovereign tribes within its boundaries. Who in this case represents the legal interests of non-member parents of tribal children? No one. I do not find this particularly satisfying for a court that prides itself on procedural fairness.

---

[10] With this in mind I make three casual observations about the court's decision. First, I am dubious of any analysis about tribal court adjudicatory authority over non-members that begins by rejecting *Montana v. United States*, 450 U.S. 544 (1981), as the fundamental lens for the analysis. Second, the court conspicuously avoids discussing substantial case law indicating that the *Montana* exceptions to the presumption that tribal courts do not have adjudicatory authority over non-members relate only to non-member conduct within reservations, which are virtually non-existent in Alaska. *See, e.g.*, *Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316, 327-35 (2008) (explaining *Montana*'s general principle's scope, specifying that "*Montana* and its progeny permit tribal regulation of non-member *conduct* inside the reservation that implicates the tribe's sovereign interests"). Finally, under a *Montana* exception a non-member may consent to tribal court jurisdiction even if the tribal court otherwise would have no adjudicatory authority over the non-member. 450 U.S. at 565. It is difficult to understand why the non-member parent's consent to tribal court adjudicatory authority in *John v. Baker*, 982 P.2d 738, 743 (Alaska 1999), now — in retrospect — demonstrates that tribal courts have adjudicatory authority over all non-member parents of tribal children regardless of consent.

In my view whether tribal courts have adjudicatory authority over non-member parents of tribal or tribal-eligible children with respect to matters involving those children — when those matters arise untethered to Indian country — is a matter best left for a day when we actually have before us a dispute between a tribe and a non-member parent. Although the court's ultimate conclusion certainly is not implausible,[11] I do not join it or its underlying analysis.

---

[11]    *Cf. Simmonds v. Parks*, 329 P.3d 995, 1017-22 (Alaska 2014) (concluding tribal court's non-territorial-based claim of adjudicatory authority to terminate non-member parent's parental rights to tribal child was "plausible" so that non-member parent was required to exhaust tribal court remedies before seeking state court relief).